**In the Matter of the WELFARE OF Shirley HILLSTROM.**

No. C9–84–1270.

Court of Appeals of Minnesota.

March 12, 1985.

R. Lawrence Harris, Melchert, Hubert, Sjodin & Willemssen, Waconia, for S. Hillstrom.

Diane M. Carlson, Spencer G. Kluegel Law Firm, Minnetonka, guardian ad litem.

Hubert H. Humphrey, III, Atty. Gen., Mary Stanislav, Sp. Asst. Atty. Gen., St. Paul, intervenor.

Marcia Rowland, Carver County Atty., Virginia D. Palmer, Asst. County Atty., Chaska.

Heard, considered and decided by FOLEY, P.J., and LANSING and NIERENGARTEN, JJ.

## OPINION

LANSING, Judge.

The attorney and guardian ad litem for Shirley Hillstrom, a mentally retarded woman, appeal from a judgment of the district court determining that surgical sterilization is in Hillstrom's best interest under Minn.Stat. § 252A.13, subd. 4 (1982). They contend the statute as applied violates her right to due process and equal protection of the law by invading her fundamental right to privacy. We reverse.

## FACTS

Shirley Hillstrom is a 41-year-old mentally retarded woman who was adjudicated mentally deficient and became a ward of the State in 1956 at the age of 12. She lived at the state hospital in Faribault from 1956 through 1968 and at the Minnesota Valley Social Adaptation Center in St. Peter from 1968 through 1976. From 1976 to the present she has resided at Community Living, a residential facility for mentally retarded men and women in Victoria, Minnesota. She attends the Carver County Developmental Achievement Center in St. Bonifacius and does part-time cleaning work at a car dealership in Victoria. Although allowed some freedom of movement, Hillstrom is closely supervised most of the day and is not allowed to leave the Community Living grounds without supervision.

According to her most recent psychological evaluation, performed in June 1983, Hillstrom functions in the mild range of mental retardation, although her adaptive functioning is in the mild to moderate range. Her age equivalent is eight years, ten months, and her full scale score on the Wechsler Adult Intelligence Test (Revised) was 56. She cannot read, write, or count above three.

The only substantiated incident of sexual intercourse in her life occurred at the age of 12 when she became pregnant as the result of incest with either her father or brother. Shortly after she became pregnant, she was committed to the state hospital. The child was born there when she was 13. According to her present physician, the child died of congenital heart disease; according to the psychologist who most recently evaluated her, the child was adopted but Hillstrom was led to believe it had died.

Hillstrom began taking oral contraceptives in 1971. She stopped using them in 1981 because she developed fibrocystic breast disease. Despite her physician's opinion that oral contraceptives were no longer a suitable method of birth control because of her age and health, they were prescribed for her again in 1983 when she attended a summer camp that was less closely supervised than Community Living. She did not become pregnant during the two-year interval she was not using contraceptives.

In November 1982 staff members at Community Living asked Carver County Social Services to seek approval for Hillstrom's sterilization from the Department of Public Welfare. In November 1983 that approval was granted. The County then petitioned the court for an adjudication that sterilization would be in Hillstrom's best interest under Minn.Stat. § 252A.13, subd. 4, which governs sterilization of wards of the State.

There is no indication in the record that Hillstrom has had sexual intercourse since her child was conceived in 1956. The concern about birth control apparently derives from the impression of the staff and others that Hillstrom is friendly, flirtatious, and "vulnerable to sexual exploitation."

The director of Community Living testified, in response to questioning about why he felt the surgery was necessary:

I guess basically * * * there is opportunity for sexual activity. Shirley has demonstrated an interest in sexual activity. She never has been observed at intercourse, nor will she be observed at intercourse. Privacy will be allowed.

We will never be able to document that. There's probably a good deal of doubt whether intercourse is happening.

Hillstrom's physician testified:

Shirley came to talk to me [in February] about her possible tubal. * * * I asked her about how she felt about having an operation. She said she didn't really feel too good about it because she had to keep talking to people about it. We discussed the question of whether she would ever be sexually active. She didn't think she would. I said if we know that you will not be playing with a man's body you will not need that operation. She said [she] didn't think she ever * * * would. Then I asked her what she thought she should do. She said she thought she should have the operation. I asked her if this is because she might be sexually active in the future. She told me she couldn't really be sure she wouldn't. Shirley is a very affectionate girl who touches constantly and likes to hug. It would be my opinion it would be very easy for her to be seduced unless she were attended to on a constant basis.

Hillstrom told her guardian ad litem that she does not have sexual intercourse and does not intend to in the future because she "doesn't want any more babies." The guardian ad litem also testified that Hillstrom said she believed she should have the operation because "everyone said she should have it."

The physician testified that Hillstrom would have to use some form of birth control through age 54 and that he did not seriously consider alternatives to sterilization because he did not think other forms of birth control were appropriate. He testified that she does not have the capacity to use a diaphragm properly. He said an intrauterine device (IUD) would pose few health risks because Hillstrom is "under good medical supervision." However, he prefers surgical sterilization over an IUD:

[b]ecause of the [IUD's] five percent failure rate; because of the fact it has to be removed periodically and re-inserted; because of the fact that insertion is a blind procedure and you can't tell when you put it in for sure that it is in the right position, so you don't know for sure that it will work, and I guess my feeling is that you got a gal here who is 41, she shouldn't be having babies, retarded or not. She is retarded, there is big problems involved there with the child should she have it, with adopting it. So I am looking at it on an economic basis too. I really believe that Shirley wants to have a tubal. I would not force it on her.

The nursing director at Community Living prefers surgical sterilization over an IUD because Hillstrom becomes tense during pelvic examinations and would probably require medication or anesthetic during insertion of an IUD. She also expressed concern that the spotting between menstrual periods, which is not a "terribly uncommon" side effect of the IUD, would mask signs of cancer or infection. However, the nursing director also testified that Hillstrom's personal hygiene is good and that Hillstrom has promptly reported all medical problems in the past.

At trial the County presented reports of a physician, a psychologist, and a social worker as required under Minn.Stat. § 252A.13, subd. 4 (1982). They and several other witnesses testified for the county. The guardian ad litem testified for Shirley Hillstrom. The trial court found that:

### XI.

Ms. Hillstrom is friendly and affectionate, solicits attention from men, and has "boyfriends" at Community Living.

### XII.

Ms. Hillstrom is vulnerable to being seduced, because of her affectionate nature and freedom from constant supervision.

* * * * * *

### XV.

Other forms of contraception are not appropriate for Ms. Hillstrom; she cannot properly monitor and otherwise use the diaphragm, IUD or cervical cap.

## XVI.

Tubal fulguration is the least invasive method of sterilization for Ms. Hillstrom.

The trial court concluded that sterilization is in Hillstrom's best interest and granted consent for the procedure.

### ISSUE

Does Minn.Stat. § 252A.13, subd. 4 (1982), as applied, deny Shirley Hillstrom due process of law?

### ANALYSIS

In 1975 the Minnesota Legislature enacted legislation to provide a coordinated approach to the supervision, protection, and habilitation of mentally retarded persons. *See* Minnesota Mental Retardation Protection Act, 1975 Minn.Laws, ch. 208, §§ 1–21. This legislation included a provision empowering the State to consent to a ward's sterilization and a judicial procedure for determining whether the sterilization is in the best interest of the ward. *See id.* § 13 (codified at Minn.Stat. § 252A.13). Shirley Hillstrom's attorney and her guardian ad litem challenge the constitutionality of this legislation, contending that Minn.Stat. § 252A.13, subd. 4 (1982), as applied, denies Hillstrom due process and equal protection of the law under the United States Constitution.

The constitutionality of this statute has not previously been decided. The statute provides:

[N]o person committed to the guardianship or conservatorship of the commissioner may be sterilized unless the commissioner consents to such operation * *. In every case a probate or county court shall determine if such operation is in the best interest of the ward. In making its determination the court shall require the commissioner to provide written reports

from a licensed physician, a psychologist who is qualified in the diagnosis and treatment of mental retardation and a social worker who is familiar with the ward's social history and adjustment. The reports shall consider whether sterilization is in the best interest of the ward and the medical report shall specifically consider the medical risks of sterilization and whether alternative methods of contraception would be as effective in protecting the best interest of the ward.

Minn.Stat. § 252A.13, subd. 4 (1982).

The statute does not specify a standard of proof or any criterion other than "the best interest of the ward." The trial court did not address the standard of proof question; it issued an order in the terms of the statutory language. Appellants contend that clear and convincing proof is constitutionally mandated before a retarded person may be sterilized.

Determination of the proper standard of evidentiary proof requires an analysis of the affected rights. The United States Supreme Court first recognized a societal right to approve sterilization in 1927, when it upheld the constitutionality of the Virginia compulsory sterilization statute in *Buck v. Bell*, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). Compulsory sterilization laws were motivated by society's interest in preventing the birth of more incompetents.[1] Medical and scientific advances, together with society's view of the legal rights and the humanity of the mentally retarded, have changed since that time, and eugenics as a basis for sterilization is now largely discredited. *See The Clear and Convincing Evidence Standard, supra* note 1, at 419.

This change was reflected in the Court's opinions as early as 1942. In *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86

---

1. The eugenics movement was begun in 1904 on the assumption that certain types of individuals were more socially desirable than others, and the less desirable should be prohibited from increasing their kind. Eugenicists argued that mental illness, retardation, epilepsy, criminality, and various social defects were hereditary and could be eliminated through sterilization. Com-

ment, *Protection of the Mentally Retarded Individual's Right to Choose Sterilization: The Effect of the Clear and Convincing Evidence Standard,* 12 Cap.U.L.Rev. 413, 419 n. 37 (citing Comment, *Sterilization of the Developmentally Disabled: Shedding Some Myth Conceptions,* 9 Fla.St.U.L. Rev. 599, 603 (1981)) [hereinafter cited as *The Clear and Convincing Evidence Standard* ].

L.Ed. 1655 (1942), the Supreme Court struck down an Oklahoma statute that authorized the sterilization of persons convicted of certain crimes. The Court, finding that the law violated equal protection, stated, "Marriage and procreation are fundamental to the very existence and survival of the race." 316 U.S. at 541, 62 S.Ct. at 1113.

The Supreme Court has continued to expand the cluster of rights protecting the physical integrity of the human body in other decisions relating to marriage, sexual relations, and childbearing. In *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Court held that a state statute which criminalized the use of contraceptives infringed the fundamental right of marital privacy. In *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Court extended the rationale of *Griswold* to unmarried individuals:

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

*Id.* at 453, 92 S.Ct. at 1038 (emphasis in original). The fundamental nature of this right was further expanded in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

Although the Court has not specifically addressed the issue of voluntary sterilization as a fundamental right, the cases involving contraception presage this recognition. Other courts have recognized both the right to procreate and the right to be sterilized. *See Hathaway v. Worcester City Hospital,* 475 F.2d 701, 706 (1st Cir. 1973); *Ruby v. Massey,* 452 F.Supp. 361, 368 (D.Conn.1978); *Voe v. Califano,* 434 F.Supp. 1058, 1061 (D.Conn.1977); *Peck v. Califano,* 454 F.Supp. 484, 486–87 (D.Utah

1977); *In re Moe,* 385 Mass. 555, 565, 432 N.E.2d 712, 719 (1982); *In re Grady,* 85 N.J. 235, 247–48, 426 A.2d 467, 473 (1981); *In re Moore,* 289 N.C. 95, 103–04, 221 S.E.2d 307, 312–13 (1976).

Our present sterilization laws provide for neither the discredited compulsory sterilizations of the past nor the voluntary contraceptive sterilizations that fall under the right to privacy articulated in *Griswold.* They provide for sterilization when the mentally retarded person cannot make a personal procreative choice, and the exercise of the personal procreative right must come from the court. Although this distinction is intellectually clear, the difficulty arises in applying the protections for the private fundamental right to be free of governmental intrusion while at the same time recognizing the rights of individuals who are incapable of making such choices alone.

Several compelling interests have been advanced to justify this type of court-ordered sterilization: the perceived harm caused to society by the presumed inability of a retarded person to serve as a parent, the burden on families that are willing to care for their retarded children at home but are unable to care for grandchildren that may result without reproductive control,[2] and the recognition that a decision not to procreate is a valuable incident of the right to privacy and should not be discarded solely because the incompetent condition prevents the conscious exercise of free choice. *See In re Grady,* 85 N.J. at 250, 426 A.2d at 474. In addition, we note that all decisions relating to the administration of birth control affect a ward's fundamental right of privacy and that popular birth control methods (including those rejected for Shirley Hillstrom) can have troublesome side effects. The State has a compelling interest in ensuring that those in its care do not use birth control methods that are injurious to their health.

---

**2.** Sherlock & Sherlock, *Sterilizing the Retarded: Constitutional, Statutory and Policy Alternatives,* 60 N.C.L.Rev. 943, 953 (1982).

■ Carver County and the State of Minnesota argue that the government interest under this type of statute is identical to the private interest, and therefore there is no governmental intrusion. We do not consider the interests of the State and the ward to be so congruent. Diminished worry, convenience, a desire to be relieved of responsibility for close supervision, and inability to deal with a difficult problem may cause even the most well-intentioned guardian to act against the retarded person's best interest. *See In re Eberhardy*, 102 Wis.2d 539, 573–74, 307 N.W.2d 881, 897 (1981). The fundamental right involved must be safeguarded to assure that sterilization is not a subterfuge for convenience and relief from the responsibility of supervision.

■ The United States Supreme Court has required an elevated standard of proof when the interest at stake is more than a property right. *See Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). In *Santosky* the Court held that the State must provide clear and convincing evidence in a proceeding to terminate parental rights; in *Addington* the same standard was required for civil commitment to a mental institution. The factors to be considered are (1) the nature of the private fundamental rights; (2) the intrusion on those rights by government interests; (3) the balancing of these interests; and (4) the allocation of the risk of an erroneous decision. The higher standard of proof in those cases was triggered by the great degree of government intrusion, the need to protect the private interest, and the great injury that would follow from an erroneous decision.

Carver County and the State argue that imposing a standard of clear and convincing proof on the sterilization decision diminishes the protection of Hillstrom's fundamental right to choose *not* to procreate. The conceptual construct they offer places the choice to have children at one end of a continuum and the choice not to have children at the other. They argue that imposing an evidentiary standard that is not in the center necessarily encroaches on one of the protected choices. If this were true, the clear and convincing standard would burden the choice to prevent procreation by sterilization. However, the statutory standard of "best interest of the ward" is properly located in the middle of that continuum, and a requirement that its elements be proved by clear and convincing evidence does not burden either choice; it only ensures that the decision is carefully made.

Courts addressing this issue have almost uniformly required an evidentiary standard of clear and convincing evidence. *See, e.g., Wentzel v. Montgomery General Hospital, Inc.*, 293 Md. 685, 703, 447 A.2d 1244, 1253–54 (1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983); *In re Grady*, 85 N.J. at 265, 426 A.2d at 483 (1981); *In re Hayes*, 93 Wash.2d 228, 238, 608 P.2d 635, 641 (1980).

In *Motes v. Hall County Department of Family and Children Services*, 251 Ga. 373, 306 S.E.2d 260 (1983), a Georgia statute provided for a preponderance of the evidence standard in sterilization proceedings. The court found that the sterilization statute was akin to the termination of parental rights in *Santosky* and held that due process requires clear and convincing evidence to sterilize an individual. *Id.* at 374, 306 S.E.2d at 262. The court reversed the trial court's judgment authorizing sterilization but did not reach the equal protection issues. *See id.* at 374–75, 306 S.E.2d at 262.

■ The State argues that because the Minnesota statute contains no burden of proof, *Motes* is inapplicable. However, the absence of a standard of proof does not cure the statute of constitutional defects or eliminate the standard of proof question. Some standard must be applied, and statutes are to be construed to avoid an unconstitutional result. *See* Minn.Stat. § 645.-17(3) (1982).

■ Under our application of the *Santosky-Addington* tests, we conclude that the

higher degree of proof is constitutionally required. The governmental imposition of a surgical procedure that terminates the capacity to bear or beget children is a substantial intrusion in the area of a fundamental right. There are important societal as well as important personal interests on both sides of the equation, and the decision must be carefully made because it is irreversible. In order to assure that abuses do not occur, and to screen out those individuals who should not be sterilized, clear and convincing evidence is required.

On the record before us, the State has failed to meet its burden of showing by clear and convincing evidence that sterilization is in Shirley Hillstrom's best interest. The statute requires consideration of the medical risks of sterilization and alternative methods of contraception. Hence sterilization is a "last resort" means of contraception. The best interest standard therefore requires, at minimum, a showing that Shirley Hillstrom is likely to engage in sexual intercourse. Because she requires 24-hour supervision, her "vulnerability to being seduced" is not a valid factor in making that determination.

## DECISION

The State has failed to show by clear and convincing evidence that sterilization is in Shirley Hillstrom's best interest.

We do not reach the question whether the statute violates the equal protection clause because it was raised only tangentially by the parties and because of our decision that the State has failed to meet its burden on the due process issue.

Reversed.