# IN THE SUPREME COURT OF IOWA

No. 19–1139

Filed May 29, 2020

**STATE OF IOWA,**

Appellee,

vs.

**MERCEDES JOJEAN DAMME,**

Appellant.

---

Appeal from the Iowa District Court for Grundy County, Jeffrey L. Harris, Judge.

Defendant appeals sentence imposed after conviction based on guilty plea, and State argues lack of good cause to appeal under Iowa Code section 814.6 (2019). **AFFIRMED.**

Anne K. Wilson of Anne K. Wilson Law Office, PLLC, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Erika L. Allen, County Attorney, and Kali Adams, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

This case presents our first opportunity to adjudicate the "good cause" requirement under Iowa Code section 814.6 (2019) to appeal from a conviction based on the defendant's guilty plea. This defendant pled guilty to theft and was convicted and sentenced on July 1, 2019, the first day the amendment to section 814.6 became effective. Her appeal challenges the sentence imposed, not her guilty plea or conviction. The State argues we must dismiss the appeal because the defendant fails to show good cause as required under the amendment. This new statute does not define good cause, and we retained the case to determine its meaning in this context.

On our review, we determine this defendant satisfies the good-cause requirement to proceed with her appellate challenge to the sentence imposed. The legislature amended section 814.6 to curtail frivolous appeals from guilty pleas and thereby enforce their finality. We conclude that "good cause" means a "legally sufficient reason." We hold that the good-cause requirement is satisfied in this context when the defendant appeals a sentence that was neither mandatory nor agreed to in the plea bargain. We therefore decline to dismiss the appeal. On the merits, her challenge fails, so we affirm her sentence.

## I. Background Facts and Proceedings.

This case arises from two related thefts in Grundy Center. On March 25, 2018, Kathy Grittman's wallet was stolen off her kitchen table while she was at home. Grittman called police and told investigating officer Alissa Loew that her daughter's friend had been over to play and was picked up by Mercedes JoJean Damme, the sitter. No one else was in the house when the wallet went missing, and Grittman suspected Damme stole it. Damme had chatted with Grittman in the kitchen and asked for

a Band-Aid for a cut on her thumb, which Grittman retrieved from a connected bathroom. Damme then asked for triple antibiotic ointment, which Grittman fetched from an upstairs bathroom, leaving Damme alone in the kitchen. Shortly after Damme departed, Grittman found a Band-Aid wrapper on the table where the wallet had been. She phoned Damme, who denied taking it.

The next day, after returning home from work, Christopher Conway noticed items missing from his home, including his laptop, a lockbox that contained tax information, a flash drive, keys to his 1994 Pontiac Grand Am, and numerous rare coins. Conway had left his home unlocked while he was at work between 10 a.m. and 2:30 p.m., and the items went missing during that time. Like Grittman, Conway told police that he suspected Damme, a family friend who had been providing in-home care for Conway's sister. Conway knew that Grittman's wallet had been stolen the day before and that Damme was a suspect. Conway provided Deputy Kyle Wolthoff with Damme's contact information.

Damme had borrowed the Conway family's Ford Explorer. When Conway retrieved that vehicle from Damme at her home the following day, she gave him its keys on a ring that also held the stolen keys to his Grand Am and another keychain that had been in the stolen lockbox. Damme denied knowing what the stolen keys were for and claimed that they were already on the Ford's key ring when she borrowed it. Conway notified Deputy Wolthoff, who obtained a warrant to search Damme's home in Waterloo.

Deputy Wolthoff, another investigator, and two Waterloo police officers executed the search warrant. They recovered many of the stolen items, including the lockbox, some of the coins, the flash drive, Conway's social security card, a laptop, and Grittman's driver's license. Damme

initially claimed the items were hers and then changed her story to claim they were given to her by her ex-boyfriend. The officers also found methamphetamine and drug paraphernalia, which Damme admitted belonged to her. She was arrested on drug charges. Conway later identified the items stolen from him.

On May 22, Damme was charged in two separate cases with theft in the third degree in violation of Iowa Code sections 714.1(1) and 714.2(3). Damme entered a plea of guilty in each case on March 18, 2019. The State agreed to seek no more than a two-year sentence that would be suspended if Damme was accepted into the program with the Waterloo Women's Center for Change. The State agreed to follow a recommended sentence in the presentence investigation if it was more lenient.

The court conducted the sentencing hearing on July 1. Despite the State's recommendations that aligned with the plea agreement, the court declined to impose a suspended sentence or one in the range stipulated in the plea agreements. The sentencing court stated it "considered the argument of [Damme's] counsel and extenuation and mitigation" and recited numerous facts from the presentence investigation that it contemplated when determining the requisite sentence.

The court began with mitigating factors. The court stated it "was saddened by the fact that" Damme had been sexually abused by her stepfather when she was young, for which he served a prison term. "Also in extenuation and mitigation," the court noted that Damme has ongoing mental health and substance abuse concerns, that her parental rights to three of her four children had been terminated, and that she had been the victim in numerous criminal reports. Additionally, the court considered her family's criminal history in mitigation,

> [I]t is clear to this Court that your family stock is not good. You clearly have not had positive role models in your life. Your father has served four prior prison terms. Your stepfather has served ten years of prison on the sexual abuse convictions involving you. Your mother has prior convictions and probation but no prison. Your first half-sister has prior arrests but no prison. A half-brother – your first half-brother has prior felony convictions. Your second half-brother has multiple misdemeanor convictions and five separate prison terms, and a second half-sister has been put on probation for operating while intoxicated first.

The court next transitioned to aggravating factors, stating, "At the outset[,] this Court would note that the presentence investigation [report (PSI)] consisting of 20 pages is in no way flattering to [Damme]." Continuing with aggravating factors, the court recited Damme's own criminal history in some detail, telling Damme,

> [Y]ou are an agent of criminality. You are a train wreck. You have been for the last nine or ten years of your life. . . . I'm convinced that you're going to be back in here again after you get out of prison. I'm really hoping you can prove me wrong.

Before pronouncing the sentence, the court stated,

> [T]his is the second time this case has been set for sentencing. When it was first set, the Court spent an extensive period of time reviewing the case files and the presentence investigation. I spent another hour to two hours last night going through my notes and once again reviewing the case files and the presentence investigation. This Court takes a sentence of imprisonment or confinement extremely seriously because it results in not only the deprivation of liberty for the particular defendant, but it also affects the defendant's family.
>
> Ma'am, you have placed considerable distance between yourself and your responsibilities as a law abiding citizen. This Court remains mindful of your counsel's argument about matters that have been horrendous in your life and your attempts to counteract the influence of those matters.

The court sentenced Damme to an indeterminate term of two years of incarceration for each case to run concurrently. It ordered Damme to pay a $625 fine, a criminal surcharge of thirty-five percent, court costs, victim restitution, attorney fees, and the law enforcement initiative

surcharge of $125. Damme also had to submit a DNA sample. The court determined that Damme did not have the ability to pay restitution and waived those costs.

On July 8, Damme appealed. We retained the case to address the good-cause requirement.

## II. Standard of Review.

"Our review of a sentence imposed in a criminal case is for correction of errors at law." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). We will not reverse a sentence unless there is "an abuse of discretion or some defect in the sentencing procedure." *Id.* We review ineffective-assistance-of-counsel claims de novo. *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018). "We employ a substantial compliance standard in determining whether a trial court has discharged its duty under rule 2.8(2)(*d*)" to advise a defendant of her right to file a motion in arrest of judgment and the penalties of failing to do so. *State v. Straw*, 709 N.W.2d 128, 132 (Iowa 2006).

## III. Analysis.

We first decide whether good cause exists to consider Damme's appeal. Next, we consider her alleged sentencing errors. We then review her claim the district court failed to advise her of her right to file a motion in arrest of judgment. Finally, we turn to her ineffective-assistance-of-counsel claims.

**A. Sentencing Challenge.** Damme argues that the sentencing court abused its discretion by considering improper factors when imposing her sentence. She asks us to find an abuse of discretion, vacate her sentence, and remand for resentencing. The State, citing to the newly amended Iowa Code section 814.6, counters that we lack jurisdiction over her appeal from her guilty plea absent a showing of good cause. *See* Iowa

Code § 814.6(1)(*a*)(3). The amendment plainly applies to Damme's appeal because her judgment and sentence were entered on July 1, 2019.[1] The State asserts that Damme has not established good cause and that we must dismiss her appeal. We disagree.

1. *Good cause.* During the last session, the Iowa legislature amended Iowa Code section 814.6, effective July 1, 2019, as follows:

> [1. Right of appeal is granted the defendant from:]
>
> *a.* A final judgment of sentence, except in ~~case of~~ the following cases:
>
> . . . .
>
> (3) A conviction where the defendant has pled guilty. This subparagraph does not apply to a guilty plea for a class "A" felony or in a case where the defendant establishes good cause.

2019 Iowa Acts ch. 140, § 28 (codified at Iowa Code § 814.6(1)(*a*) (2020)); *see also State v. Macke*, 933 N.W.2d 226, 231 (Iowa 2019) (describing the amendment to section 814.6). The amendment limited the defendant's right to appeal after a conviction when the defendant pled guilty. Damme does not challenge the constitutionality of the 2019 amendment to Iowa Code section 814.6. A defendant who pled guilty now must establish good cause to appeal. Iowa Code § 814.6(1)(*a*)(3). The legislature did not define

---

[1] In *State v. Macke*, we held that the 2019 amendments to Iowa Code sections 814.6 and 814.7 do not apply retroactively to direct appeals from a judgment and sentence entered before the statute's effective date of July 1, 2019. 933 N.W.2d 226, 228 (Iowa 2019). The determinative date is the date of the judgment of sentence that is appealed, not whether the appeal was pending on July 1, 2019. *Id.* In *State v. Trane*, we stated that *Macke* held "claims of ineffective assistance of counsel may be decided on direct appeal if the *appeal* was already pending on July 1, 2019, when Senate File 589 became effective." 934 N.W.2d 447, 464 (Iowa 2019) (emphasis added). While most appeals pending on the statute's effective date would be from judgments entered before that date, the new statute would apply to an appeal filed the same day as a judgment entered on July 1. Conversely, the amendment would not govern a timely appeal in mid-July from a judgment entered in mid-June 2019. We reiterate that date of the *judgment* being appealed controls the applicability of the amendment to section 814.6. *Macke*, 933 N.W.2d at 228; *see also State v. Draine*, 936 N.W.2d 205, 206 (Iowa 2019) (same).

"good cause" in this statute.  Good cause is defined in a variety of ways elsewhere in the Iowa Code and Rules of Procedure.[2]

"[W]hen the legislature has not defined a term, we look to the common meaning of that term in interpreting the statute." *State v. Tesch*, 704 N.W.2d 440, 451 (Iowa 2005).  A dictionary can be a reliable source for the common meaning of a word or phrase.  *Id.*  *Black's Law Dictionary* defines "good cause" to mean "[a] legally sufficient reason."  *Good Cause*, *Black's Law Dictionary* (11th ed. 2019).  We adopt that definition of good cause for section 814.6.

---

[2]Iowa Rule of Civil Procedure 1.977, for example, requires good cause to set aside a default.  The official comment states the rule "aims to give a party his day in court to present a meritorious defense" and that good cause "should require both an excuse for having defaulted, and at least a claimed defense asserted in good faith." *Id.* cmt. 8.  We elaborated that good cause to set aside a default "is a sound, effective, and truthful reason.  It is something more than an excuse, a plea, apology, extenuation, or some justification, for the resulting effect.  Good cause also requires at least a claimed defense asserted in good faith." *Cent. Nat'l Ins. Co. of Omaha v. Ins. Co. of N. Am.*, 513 N.W.2d 750, 754 (Iowa 1994).

The legislature has defined the requirements necessary to establish good cause in other sections of the Code, which vary depending on the context of the provision.  *See, e.g.*, Iowa Code § 236A.6(2) (allowing a temporary protective order on a showing of good cause, defined as a "[p]resent danger of sexual abuse to the plaintiff"); *id.* at §§ 322A.2, .15 (providing that a motor vehicle franchiser may not terminate a franchise without good cause, defined to include consideration of factors such as the volume of business, amount invested, and impact on the public welfare).  We have interpreted the meaning of "good cause" in other provisions when the legislature has not defined it, and our decisions further demonstrate that its meaning is context-specific.  *See, e.g.*, *State v. McNeal*, 897 N.W.2d 697, 704 (Iowa 2017) (describing that a good-cause inquiry in the context of speedy trial requirements under Iowa Rule of Criminal Procedure 2.33(2)(*b*) focuses on "the reason for the delay," which involves considering the length of the delay, whether the defendant demanded a speedy trial, and whether the delay prejudiced the defendant (quoting *State v. Winters*, 690 N.W.2d 903, 908 (Iowa 2005))); *Wilson v. Ribbens*, 678 N.W.2d 417, 420–23 (Iowa 2004) (stating that "good cause" to excuse failure of service pursuant to Iowa Rule of Civil Procedure 1.302 means "[t]he plaintiff must have taken some affirmative action to effectuate service of process upon the defendant or have been prohibited, through no fault of his [or her] own, from taking such an affirmative action" and adding that good cause is likely to be found when a third person causes the failure to complete service, the defendant evaded service or engaged in misleading conduct, or the plaintiff diligently tried to effect service (alteration in original) (quoting *Henry v. Shober*, 566 N.W.2d 190, 192 (Iowa 1997), *superseded by rule as stated in Dickens v. Associated Anesthesiologists, P.C.*, 709 N.W.2d 122, 127 (Iowa 2006))).

Damme bears the burden of establishing good cause to pursue an appeal of her conviction based on a guilty plea. Iowa Code § 814.6(1)(*a*)(3) (stating that the provision prohibiting an appeal from a conviction where the defendant pled guilty does not apply "in a case where *the defendant establishes good cause*" (emphasis added)); *see In re A.S.*, 906 N.W.2d 467, 475 (Iowa 2018) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established." (quoting Iowa R. App. P. 6.904(3)(*e*))). Because what constitutes good cause is context-specific, we must determine when a defendant who pled guilty has a legally sufficient reason to appeal. We conclude the meaning of the good-cause requirement in Iowa Code section 814.6 is ambiguous in this context. The parties disagree as to its meaning, we have given varying definitions to the term good cause in other statutes and rules as noted above, and we have expressly found good-cause provisions to be ambiguous. *See, e.g.*, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Att'y Doe No. 819*, 894 N.W.2d 1, 11–12 (Iowa 2016) (resolving ambiguity in good-cause provision in Iowa Ct. R. 36.7 (2016)).

Accordingly, in determining what constitutes a legally sufficient reason to appeal after a guilty plea, we consider what the statute meant to accomplish. *Rhoades v. State*, 880 N.W.2d 431, 447 (Iowa 2016). "We seek to advance, rather than defeat, the purpose of the statute." *Id.* In the 2019 amendment to Iowa Code section 814.6(1)(*a*)(3), according to the State, the legislature's purpose was "to restrict direct appellate review of most guilty plea challenges." Yet section 814.6(1)(*a*)(3) expressly allows an appeal if the defendant establishes good cause. The State argues that "good cause" in this context "is limited to extraordinary legal challenges which cannot be heard elsewhere." Damme, however, is not challenging her guilty plea.

Damme argues that she has established good cause to appeal a sentencing error arising after the district court accepted her guilty plea. She claims that the sentencing court considered improper factors to impose a sentence of incarceration rather than a suspended sentence as agreed in her plea bargain. We readily distinguish appeals challenging the guilty plea itself[3] from appeals challenging the sentence imposed after the plea is accepted. Damme falls in the latter category. She does not challenge her guilty plea or the resulting conviction, only the sentence imposed.

We hold that good cause exists to appeal from a conviction following a guilty plea when the defendant challenges his or her sentence rather than the guilty plea. Damme received a discretionary sentence that was neither mandatory nor agreed to as part of her plea bargain, and she is appealing that sentence and asking for resentencing without challenging her guilty plea or conviction. A sentencing error invariably arises after the court has accepted the guilty plea. This timing provides a legally sufficient reason to appeal notwithstanding the guilty plea. We save for another day the question of what constitutes good cause to appeal to challenge a guilty plea.

We determine Damme has established a legally sufficient reason to appeal. The district court imposed a nonmandatory sentence that was outside of the range agreed to by the parties in the plea agreement, and Damme raises a challenge asserting a sentencing error. Under the

---

[3]Many appeals that seek to vacate a guilty plea will assert claims of ineffective assistance of counsel. Iowa Code section 814.7, as amended, now requires ineffective-assistance claims to be brought through a postconviction proceeding rather than a direct appeal. This provision furthers the legislative goal of curtailing frivolous direct appeals of convictions based on guilty pleas.

circumstances presented here, good cause exists to allow Damme's appeal to proceed.

2. *Merits.* Damme asserts that the sentencing court considered improper factors by relying on the criminal history of her family members. Damme maintains that it is improper for the court to punish her for their criminal activity. The State counters that the court was properly exercising its discretion in considering Damme's family circumstances.

A sentencing court's decision to impose a specific sentence that falls within the statutory limits "is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *Formaro*, 638 N.W.2d at 724. Our task on appeal is not to second guess the sentencing court's decision. *Id.* at 725. Rather, we must determine that its decision "was exercised on grounds or for reasons that were clearly untenable or unreasonable." *Id.* at 724. We afford sentencing judges a significant amount of latitude because of the "discretionary nature of judging and the source of respect afforded by the appellate process." *Id.* at 725 (describing the importance of judicial discretion). Nevertheless, "[i]f a court in determining a sentence uses any improper consideration, resentencing of the defendant is required . . . even if it was merely a 'secondary consideration.' " *State v. Grandberry*, 619 N.W.2d 399, 401 (Iowa 2000) (en banc) (citation omitted) (quoting *State v. Messer*, 306 N.W.2d 731, 732 (Iowa 1981)).

The societal goals of sentencing are to provide maximum opportunity to rehabilitate the defendant and to protect the community. Iowa Code § 901.5. A sentencing court weighs multiple factors, "including the nature of the offense, the attending circumstances, the age, character and propensity of the offender, and the chances of reform." *Formaro*, 638 N.W.2d at 725. Before imposing its sentence, "the court must additionally

consider the defendant's prior record of convictions or deferred judgments, employment status, *family circumstances*, and any other relevant factors, as well as which of the sentencing options would satisfy the societal goals of sentencing." *Id.* (emphasis added).

Damme must overcome the presumption in favor of the sentence by affirmatively demonstrating the court relied on an improper factor. *State v. Wickes*, 910 N.W.2d 554, 572 (Iowa 2018) ("A defendant must affirmatively show that the sentencing court relied on improper evidence to overcome this presumption of validity."); *State v. Hopkins*, 860 N.W.2d 550, 554 (Iowa 2015) (same); *State v. Sailer*, 587 N.W.2d 756, 763–64 (Iowa 1998) (affirming sentence when defendant did not establish "any reliance on improper factors which would overcome the presumption that the district court properly exercised its discretion").

Damme argues the court erred by relying on her family's criminal history. But we have generally held the sentencing court should consider the defendant's family circumstances. *See Formaro*, 638 N.W.2d at 725. The information regarding her family's criminal history was in the PSI report, to which Damme never objected. *See Grandberry*, 619 N.W.2d at 402 (holding that the sentencing court did not err in considering the defendant's traffic charges listed in the PSI report when the defendant did not contest that data).

Damme specifically argues the court's statement that her "family stock is not good" shows its reliance on an improper factor requiring resentencing. We strongly disapprove of the court's poor choice of words and admonish sentencing courts to refrain from referring to a defendant's "family stock" or genetics.[4] But our review of the sentencing hearing

---

[4]*See United States v. Cossey*, 632 F.3d 82, 88–89 (2d Cir. 2011) (per curiam) (holding it was improper for the sentencing court to focus "nearly entirely" on its belief

transcript confirms that the district court relied on the criminal history of Damme's family "in extenuation and mitigation." In no sense did the district court imply Damme had a genetic or familial predisposition to reoffend. Rather, the court appropriately considered her lack of role models, difficult upbringing, and family circumstances as mitigating factors. Indeed, immediately after the comment to Damme that "your family stock is not good," the court explained what it meant by stating, "You clearly have not had positive role models in your life." Her lack of parental role models is an appropriate consideration for sentencing. *Formaro*, 638 N.W.2d at 725 (allowing consideration of family circumstances). We take the court's statement about Damme's lack of positive role models "at face value." *Sailer*, 587 N.W.2d at 763 (mere mention of an improper factor does not establish sentencing court relied on it). We decline to infer the sentencing court relied on any genetic predisposition to reoffend.

The court's explanation for its sentencing decision was thorough. The court extensively evaluated mitigating and aggravating factors presented in the PSI, and it ultimately determined that Damme's conduct, criminal history, and failure to rehabilitate despite numerous opportunities outweighed the mitigating factors. After spending "an extensive period of time reviewing the case files and the presentence investigation," the court determined imprisonment was warranted. The

---

that the defendant was genetically predisposed to view child pornography and remanding for resentencing because it was "impermissible for the court to base its decision of recidivism on its unsupported theory of genetics"). Consideration of genetics in sentencing is a discredited relic of history, exemplified by the often-criticized Supreme Court case, *Buck v. Bell*, 274 U.S. 200, 207, 47 S. Ct. 584, 585 (1927) (Justice Oliver Wendell Holmes infamously stated, "Three generations of imbeciles are enough."). Here, the court's consideration of Damme's family criminal history was broader than genetic relatives and included her stepfather.

court imposed a sentence within the provided statutory range. This was an exercise of the court's discretion.

Damme failed to show that the sentencing court relied on improper factors in imposing her sentence. As such, it did not abuse its discretion. We affirm Damme's sentence.

**B. Failure to Advise of Right to File a Motion in Arrest of Judgment.** Damme argues that she was not advised of her right to file a motion in arrest of judgment or of the consequences of failing to file such a motion. *See* Iowa R. Crim. P. 2.24(3)(*a*). It is puzzling that Damme raises this argument on appeal when she is not seeking to vacate her guilty plea. Iowa Rule of Criminal Procedure 2.24(3)(*a*) states,

> *Motion in arrest of judgment; definition and grounds.* A motion in arrest of judgment is an application by the defendant that no judgment be rendered on a finding, plea, or verdict of guilty. Such motion shall be granted when upon the whole record no legal judgment can be pronounced. A defendant's failure to challenge the adequacy of a guilty plea proceeding by motion in arrest of judgment shall preclude the defendant's right to assert such challenge on appeal.

The rule provides defendants with an avenue to challenge the factual basis for a guilty plea or the guilty plea proceeding. *See* Iowa R. Crim. P. 2.24(3)(*d*) ("The effect of an order arresting judgment on the ground the guilty plea proceeding was defective is to place the defendant in the same situation in which the defendant was immediately after the indictment was found or the information filed[.]"). "The rule has no applicability to a situation . . . where the defendant does not know the deficiency in the plea proceeding until after sentencing," such as a challenge to the sentence imposed, as Damme raises. *State v. Thompson*, 856 N.W.2d 915, 921 (Iowa 2014).

In any event, Damme was adequately advised of her right to file a motion in arrest of judgment. *See* Iowa R. Crim. P. 2.8(2)(*d*) ("The court

shall inform the defendant that any challenges to a plea of guilty based on alleged defects in the plea proceedings must be raised in a motion in arrest of judgment and that failure to so raise such challenges shall preclude the right to assert them on appeal."). "Substantial compliance with rule 2.8(2)(*d*) is mandatory . . . ." *State v. Fisher,* 877 N.W.2d 676, 680 (Iowa 2016). "[R]egardless of whether the information is imparted through a colloquy or a written plea, the defendant must be made aware of the substance of rule 2.24(3)(*a*)." *Id.* at 681; *see also State v. Barnes*, 652 N.W.2d 466, 467 (Iowa 2002) (per curiam) (stating a written guilty plea that clearly states the substance of the rule requirements is sufficient to properly inform the defendant). Each of the written guilty pleas Damme's counsel filed on March 18, 2019, contained a provision stating,

> I understand that if I wish to attack the validity of the procedures involved in the taking of my guilty plea, I must do so by a Motion in Arrest of Judgment filed with this Court. I understand that such motion must be made not later than forty-five days after my plea of guilty, but in any case not later than five days before the date set for sentencing.

Another provision provided that,

> Having read and completed this entire form, I waive my right to file a Motion in Arrest of Judgment and to a fifteen day delay in sentencing after this plea and respectfully ask the Court to accept both and waive my presence for the purpose of pleading guilty and sentencing. I consent to and affirmatively request that the Court accept this Written Plea of Guilty and proceed to sentence me accordingly.

Damme initialed both provisions and signed the document.

These written guilty plea provisions are sufficient to satisfy the requirements of rules 2.24(3)(*a*) and 2.8(2)(*d*). The provisions plainly state that she must file a motion in arrest of judgment to attack the validity of her guilty plea proceeding and listed the proper filing deadlines. As such, the written guilty plea "conveyed the pertinent information and

substantially complied with the requirements of rule 2.8(2)(*d*)." *Straw*, 709 N.W.2d at 132. The written guilty plea made Damme aware of her right to file a motion in arrest of judgment, and she waived that right.

We hold that there was substantial compliance with the requirements of rules 2.24(3)(*a*) and 2.8(2)(*d*). Damme is not entitled to relief on these grounds.

**C. Ineffective Assistance of Counsel.** Damme claims her counsel provided constitutionally deficient representation by failing to object to the sentencing court's consideration of improper factors and failing to file a motion to reconsider sentence. The State asserts that we lack jurisdiction over her ineffective-assistance-of-counsel claims after the 2019 amendment to Iowa Code section 814.7 that eliminated the ability to pursue such claims on direct appeal:

> An ineffective assistance of counsel claim in a criminal case shall be determined by filing an application for postconviction relief pursuant to chapter 822. The claim need not be raised on direct appeal from the criminal proceedings in order to preserve the claim for postconviction relief purposes, and the claim shall not be decided on direct appeal from the criminal proceedings.

Iowa Code § 814.7. Section 814.7 became effective on July 1, 2019, and the judgment and sentence in Damme's case was entered on that date. Damme does not challenge the constitutionality of the 2019 amendment to section 814.7. The amendment applies, *see Macke*, 933 N.W.2d at 228, and we lack authority to consider her ineffective-assistance-of-counsel claims on direct appeal.

**IV. Disposition.**

For the foregoing reasons, we affirm the sentence imposed by the district court.

**AFFIRMED.**

All justices concur except Appel, J., who concurs in part and dissents in part, and McDonald, J., who separately concurs in part and dissents in part.

**APPEL, Justice (concurring part and dissenting in part).**

The district court stated that the defendant came "from poor stock" in considering his sentence. I think it is error for the district court to consider heredity without any scientific basis in sentencing, as stated in *United States v. Cossey*, 632 F.3d 82, 87–89 (2d Cir. 2011) (per curiam). In *Cossey*, the reference to unscientific genetics is given far more emphasis by the sentencing judge than in this case. But our caselaw does not permit us to determine whether improper factors were secondary to a sentencing decision. *See State v. Granberry*, 619 N.W.2d 399, 401 (Iowa 2000) ("If a court in determining a sentence uses any improper consideration, resentencing of the defendant is required . . . even if it was merely a 'secondary consideration.'" (citation omitted) (quoting *State v. Messer*, 306 N.W.2d 731, 733 (Iowa 1981)).

I agree with the majority that consideration of *environment* as a *mitigating* factor may certainly be allowable, and even required, in the case of a juvenile offender. By way of example, one recent case, *Tisdale v. State*, 257 So. 3d 357 (Fla. 2018), notes the "criminality" of the minor defendant's father as it was referenced in the defendant's sentencing order, and noted that

> it is clear that [the defendant's] childhood was fraught with "trauma and adverse environments," all of which should be considered in determining the appropriate sentence . . . . While this type of mitigation does not serve as an "excuse" for committing a violent act[,] . . . it is important that judges and juries understand its significance in shaping a defendant's development and choices when evaluating mitigation.

*Id.* at 363–64 (quoting *State v. Bright*, 200 So. 3d 710, 726 (Fla. 2016)).

Such a consideration is markedly different from consideration of *hereditary criminality*, unsupported by both science and the law, as an

*aggravating* factor in sentencing. Such specious theories have long plagued the American criminal justice system, fueled by the eugenics movement, creating harmful, pervasive, and persistent misconceptions and unarticulated presuppositions, particularly against traditionally marginalized communities. The idea of hereditary criminality has long been discredited. In 1877, Richard Dugdale published *The Jukes: A Study in Crime, Pauperism, Disease, and Heredity: Also Further Studies of Criminals*, which studies five generations of the Jukes family, after Dugdale realized several family members were all related and incarcerated in the same upstate New York jail. *See* Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 49 (2016). Of the 709 individuals of the Jukes family that Dugdale identified, more than half were criminals. *Id.* Dugdale concluded that the Jukes's problems were due to environment, not heredity, and introduced concepts such as generational poverty and crime, exacerbated by lack of appropriate social safety net and public education. *Id.*

Discredited criminal heredity theories, like those of now-defamed anthropologists Arthur Estabrook, Francis Galton, and Charles Davenport, continued to shape our law and society. *Id.* at 153–55. Many of these theories demonized people of color and immigrant communities as inherently inferior and biologically dispossessed to criminality. *Id.* at 130–33, 155–59. These theories led to the enactment of laws in several states finding "that idiocy, insanity, imbecility, and criminality are congenital and hereditary," and further, approving of the "asexualization" of such persons through sterilization on that basis. *See, e.g., State v. Feilen*, 126 P. 75, 76–77, 78 (Wash. 1912) (enforcing such punishment on a defendant in Washington, based in part upon their survey of similar laws in California, Connecticut, Indiana, Iowa, and New Jersey). Perhaps the

most famous case of this kind is *Buck v. Bell*, 274 U.S. 200, 47 S. Ct. 584 (1927), infamous for its refrain that "[t]hree generations of imbeciles are enough." *Id.* at 207, 47 S. Ct. at 585.

Iowa was also one such state which approved of the sterilization of "criminals, rapists, idiots, feeble-minded, imbeciles, lunatics, drunkards, drug fiends, epileptics, syphilitics, moral and sexual perverts, and diseased and degenerate persons" both as imprisoned and as a condition of parole. *See* Iowa Code § 2600-p (Supp. 1913). Though my admonition against finding nonexistent links of hereditary criminality, especially as it pertains to race and nonheritable disease, may seem old hat to some in 2020, I feel compelled to join the continuing chorus of legal and scientific voices stating this principle loudly and clearly.[5]

I therefore join division III.A(1) of the majority opinion, but contend that the sentence in this case should be vacated and the matter remanded for sentencing before a different judge.

---

[5]Many modern cases continue to grapple with the pernicious use of hereditary criminality within a legal context, particularly as it regards sterilization and eugenics. *See, e.g.*, *Hernandez v. Banks*, 65 A.3d 59, 72 n.30 (D.C. 2013) (en banc) (noting the increased civil rights protections for individuals with intellectual disabilities today, as opposed to the previous belief that incurable hereditary criminality existed and must be stopped); *In re Welfare of Hillstrom*, 363 N.W.2d 871, 874 n.1 (Minn. Ct. App. 1985) (noting that increased constitutional standards would make sterilization on the basis of hereditary criminality impossible today); *In re Grady*, 426 A.2d 467, 472–73, 473 n.2 (N.J. 1981) (noting that lawmakers have been "too quick to accept unproven scientific theories of eugenics" including that "criminality . . . and various other defects were hereditary"). And of course, it also bears repeating that there are no genetic differences between so-called "races." *See, e.g.*, Russell H. Tuttle, *Apes and Human Evolution* 29–32 (2014) ("Over the past 30,000 years, there has been only one species of humankind: *Homo sapiens*. . . . The genes underlying phenotypic differences that were used to assign people to races vary much more between the presumed races than genes vary in general. Further, in contrast with chimpanzees and bonobos, millennia of admixture among waves of humans across and between continents and islands has acted against the emergence of discrete human subspecies. Consequently, *Homo sapiens* is devoid of races in the sense of zoological subspecies." (Footnotes omitted.)).

**McDONALD, Justice (concurring in part and dissenting in part).**

I respectfully concur in part and dissent in part.

I.

Damme has established "good cause" within the meaning of section 814.6 to pursue this appeal as a matter of right. *See* Iowa Code § 814.6 (2019). I reach that conclusion based on the fair and ordinary meaning of the text of the statute when considered in its relation to other amendments to chapter 814 contained within the omnibus crime bill, Senate File,589, enacted in 2019. *See State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) ("We give words their ordinary meaning absent legislative definition."); *State v. Doe*, 903 N.W.2d 347, 351 (Iowa 2017) (stating any interpretive inquiry begins with the language of the statute at issue); *In re Marshall*, 805 N.W.2d 145, 158 (Iowa 2011) ("We should give the language of the statute its fair meaning, but should not extend its reach beyond its express terms."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012) (defining "Fair Reading Method" as "determining the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued"). Because all members of the court agree that Damme has established good cause to pursue this direct appeal as a matter of right, I need not dwell on the point any further.

II.

I respectfully dissent from the majority's resolution of Damme's sentencing challenge. The law is clear regarding the district court's consideration of an impermissible sentencing factor. This court will not vacate a sentence on appeal "unless the defendant demonstrates an abuse of trial court discretion or a defect in the sentencing procedure such as the

trial court's consideration of impermissible factors." *State v. Witham*, 583 N.W.2d 677, 678 (Iowa 1998) (per curiam). "If a court in determining a sentence uses any improper consideration, resentencing of the defendant is required." *State v. Grandberry*, 619 N.W.2d 399, 401 (Iowa 2000).

Resentencing is required without regard to whether the district court considered the impermissible sentencing factor as mitigating or aggravating. A district court could no more consider a defendant's race a mitigating factor than an aggravating factor. Thus, contrary to the majority's conclusion, the relevant question is not whether the district court considered the defendant's "family stock" as a mitigating or aggravating sentencing factor. The relevant question is whether it was permissible for the district court to note the defendant's "family stock [was] not good" and then consider the defendant's "family stock" in formulating its sentence.

In imposing sentence, it is improper for the court to consider the defendant's race, ancestry, heredity, lineage, genetics, congenital traits, innate disposition, etc. *See, e.g.*, *United States v. Cossey*, 632 F.3d 82, 88–89 (2d Cir. 2011) (per curiam) (vacating and remanding the case to a different judge because the lower court considered the defendant's genetics during sentencing). Here, the district court specifically told the defendant it was considering her "family stock" and then proceeded to identify the criminal history of the defendant's family. "Stock," when used in relation to families, persons, and animals, refers to race, ancestry, heredity, lineage, genetics, congenital traits, innate disposition, etc. *See Stock, Black's Law Dictionary* (11th ed. 2019) ("The original progenitor of a family; a person from whom a family is descended[.]"); *see also Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611, 107 S. Ct. 2022, 2027 (1987) ("[M]odern dictionaries still include among the definitions of race 'a

family, tribe, people, or nation belonging to the same stock.' " (quoting *Webster's Third New International Dictionary* 1870 (1971))); *Kanis v. Rogers*, 177 S.W. 413, 413 (Ark. 1915) (referring to breeding a dog "of good stock"); *Armstrong v. State*, 11 So. 618, 624 (Fla. 1892) ("For, when the family stock has suffered from epilepsy, neuralgia, or kindred diseases, it may eventuate in insanity in following generations; indeed, that is the tendency."); *Nye v. Grand Lodge A.O.U.W.*, 36 N.E. 429, 436 (Ind. App. 1894) (" 'Blood relationship' is a term of very comprehensive meaning. It includes those persons who are of the same family, stock, or descended from a common ancestor."); *Comstock v. Taggart*, 120 N.W. 29, 30 (Mich. 1909) (referring to a horse as "a reproducer of good stock"); *Bankers' Tr. Co. v N.Y. Foundling Hosp.*, 202 N.Y.S. 90, 90 (Sup. Ct. 1923) ("Hillyer died, leaving her surviving neither husband, heir, nor next of kin, and with her death the family stock became extinct.").

It is very possible, perhaps even likely, the district court here intended to reference the defendant's childhood trauma and lack of familial stability when it referred to her "family stock." The district court, in imposing sentence, usually speaks extemporaneously and may use "unfortunate phraseology." *State v. Nichols*, 247 N.W.2d 249, 255 (Iowa 1976). The presumption of regularity acknowledges this reality and holds that an appellate court should provide the district court with latitude. However, even under the presumption of regularity afforded the district court, we cannot ignore what the district court actually said.

Given the meaning of the term "family stock," I conclude the district court, by definition, considered an impermissible sentencing factor. The majority seems to agree, expressing its strong disapproval of the district court's word choice and admonishing sentencing courts to avoid this language. Unlike the majority, however, I do not think this court can or

should excuse the error even when the error was made in good faith or with the best intentions. "To protect the integrity of our judicial system from the appearance of impropriety, [I would] vacate the defendant's sentence and remand the case to the district court for resentencing before a different judge." *State v. Lovell*, 857 N.W.2d 241, 243 (Iowa 2014).

## III.

For these reasons, I respectfully concur in part and dissent in part.